**CITY OF NEW YORK, Plaintiff,**

v.

**RITTER TRANSPORTATION INC., Ritter Transportation Co., H. R. Ritter Trucking Co., Inc. Walter Caulder, Herbert R. Ritter, and Donald W. Ritter, Defendants.**

**No. 80 Civ. 5401.**

United States District Court,
S. D. New York.

June 5, 1981.

---

**10.** See *Handley v. Kleindienst*, 471 F.2d 823, 830–831 (2nd Cir. 1972) cited in *City of Santa Clara, supra*, at 680.

Allen G. Schwartz, Corp. Counsel, by Barry L. Schwartz, New York City, for plaintiff City of New York.

Law Firm of William F. O'Connor by Douglas E. McKeon, New York City, for defendants.

Lawrence W. Bierlein, Washington, D. C., for Amicus Curiae National Tank Truck Carriers, Inc.

## OPINION

GRIESA, District Judge.

This is a motion to vacate a preliminary injunction which was entered in Supreme Court, New York County, and which was continued following removal of the case to this court. The injunction directs defendants to comply with certain provisions in the New York City Fire Department regulations, known as F.P. Directive 5–63

§§ 10.2 and 10.4b, which deal with the routes which may be used for the transportation of hazardous gases in and around New York City. The motion is denied.

## I.

The action is against Ritter Transportation, Inc. and related companies and individuals, which operate a trucking business based in New Jersey.

On August 7, 1980 a Ritter truck carrying liquefied petroleum gas developed a leak while traveling across the George Washington Bridge from New Jersey to New York City bound for Connecticut. The presence of this gas leak on a crowded bridge presented a condition of the utmost danger. It was necessary to clear the bridge, and block all traffic from using it. The incident lasted for nearly eight hours. There was a long delay in remedying the leak because of Ritter's inadequate emergency equipment. A traffic jam of monumental proportions was created and thousands of persons experienced substantial delays in their travel—in addition to the great danger presented from the incident.

New York City Fire Department regulations F.P. 5-63 §§ 10.2 and 10.4b provide that tank truck quantities of liquefied petroleum gases and other gases deemed to be hazardous by the Fire Commissioner cannot be transported through New York City unless "no practical alternative route" exists and the Fire Commissioner grants specific permission for the trip. Ritter had not obtained any permission for the August 7, 1980 trip. Indeed, shipments of tank truck quantities of hazardous gases bound from New Jersey for points north of the City are generally required to avoid the City entirely.

On August 27, 1980 the City of New York obtained an ex parte temporary restraining order in Supreme Court, New York County, enjoining Ritter from further violation of the Fire Department regulations. The hearing on the City's motion for a preliminary injunction was held before Justice Whitman on September 10, 1980. On September 17 Justice Whitman issued a memorandum granting the motion for preliminary injunction and directing the parties to settle an order. Before an order was signed in the state court, defendants removed the action to the federal court. On October 3, 1980 this court entered an order based upon Justice Whitman's ruling.

Defendants then made their motion to vacate the preliminary injunction. This motion was heard on October 8, 1980. Extensive briefs have been received since the hearing.

Defendants' principal arguments are as follows:

(a) That the Fire Department regulations are inconsistent with, and preempted by, federal law;

(b) That the regulations are an unconstitutional burden on interstate commerce;

(c) That the regulations are void for vagueness.

## II.

Before discussing the legal issues, it is useful to set forth something of the background of the present form of the Fire Department regulations. Milton Fishkin, Chief Inspector of the Fire Department, testified in this regard.

The history of the current regulations goes back to 1962, when there was a disastrous accident in Berlin, New York, involving a vehicle carrying liquefied petroleum gas, which crashed, resulting in ten deaths, a large number of injuries and a great amount of property damage. A Fire Department regulation was adopted in 1962, which was revised in 1963. The 1963 regulation is known as "F.P. Directive 5-63." Section 10.2 of this directive provided:

"10.2. Liquefied petroleum gases; liquefied chlorine; vinyl chloride or any other gases deemed to be hazardous by the Fire Commissioner shall not be stored, transported or delivered in tank trucks within the city."

This regulation would appear to impose a flat prohibition on the transportation of tank truck quantities of liquefied petroleum gas in New York City.

However, the New York City Administrative Code pertaining to the Fire Department contained the following provision, numbered C19–95.1, adopted in 1962:

"§ C19–95.1 Permit required.—It shall be unlawful to transport without a permit within the city of New York gases as defined in subdivisions 20 and 20a of Section C19–2.0 of the code, in quantities exceeding these [sic] specified under subdivisions 4 to 13 inclusive of section C19–91.0 a of the code."

Subdivisions 20 and 20a of Section C19–2.0 of the Administrative Code refer to gases under pressure in a gaseous or liquefied form which are combustible or which will form an explosive mixture. Subdivisions 4–6 of § C19–91.0 a refer to noncombustible gases. Subdivisions 7–13 of § C19–91.0 a describe relatively small quantities of combustible gases.

The Fire Department read Section 10.2 of F.P. Directive 5–63 and Administrative Code Section C19–95.1 in conjunction with each other, as prohibiting the transportation of tank trucks of hazardous gases in New York City, *except* when such transportation was permitted by the Fire Department.

The record in this case contains a copy of a letter from the Fire Department to the Port Authority of New York dated April 2, 1964 stating that on March 30, 1964 Fire Commissioner Edward Thompson had advised carriers of bulk compressed flammable gas that a route had been established for transportation of such gas through New York City. Shipments to Long Island were directed via a particular route through the City:

"... entry may be made only via the New England Thruway—to the Throgs Neck Bridge—thence via Clearview Expressway—and easterly on Long Island Expressway to the City Line."

The letter also states:

"Trucks which are destined for other Counties or States are prohibited from using all City Streets."

The notice of March 30, 1964 is not in evidence. Attached to the April 2, 1964 letter is a list of companies presumably advised of the established route, including H. R. Ritter Trucking Co. The Fire Department took the view that a permit was required even for use of the designated route, for each shipment that needed to pass through the City.

Over the years, there was no systematic enforcement of the above-described regulations. Some confusion existed about the meaning of the regulations. The Fire Department had a practice of granting permits over the telephone without even recording such permits. Law enforcement agencies found it difficult to conduct consistent surveillance to determine whether shipments of hazardous gases were proceeding through the City without authorization.

In 1979 F.P. Directive 5–63 was amended in an attempt to clarify the regulations. Sections 10.4a and 10.4b were added. Section 10.4a provides:

"10.4a. Interstate or intrastate transportation of compressed gases through the city, with no pickup or delivery in the city, shall be only in accordance with routes and times as prescribed by the Fire Commissioner, when such transportation is in tank trucks or other vehicles which do not conform to Fire Department requirements and have not been issued a Fire Department permit."

Section 10.4b provides:

"10.4b. Interstate or intrastate transportation of a hazardous compressed gas, prohibited by Section 10.2 of these specifications or otherwise banned in the public interest by the Fire Commissioner, may be authorized by the Fire Commissioner, providing the vendor can show that no practical alternative route to passage through the city exists or that a critical emergency requires delivery in the city. Any truck shipments so authorized shall conform to routes, times, and safety conditions specified by the Fire Commissioner."

According to the testimony of Chief Inspector Fishkin, Section 10.4a, despite its general reference to "compressed gas," is

intended to refer to non-hazardous compressed gases such as nitrogen and carbon dioxide. The limitations of Section 10.4a apply only to tank trucks which do not conform to Fire Department requirements and have not been issued a Fire Department permit. According to Fishkin's testimony, the Fire Department requirements on tank trucks are basically the same as the requirements of the United States Department of Transportation. No further discussion of the effect of Section 10.4a is necessary for the purposes of the present case.

Section 10.4b is, of course, directly relevant to the present case, because it is the current provision dealing with liquefied petroleum gases and other hazardous compressed gases. The effect of this section is to ban the transportation of such gases in tank truck quantities in New York City, except when authorized by the Fire Commissioner; and the section specifies that no such authorization may be granted unless it is shown that there is no practical alternative route outside the city or that a critical emergency requires delivery in the city. When authority for shipments of truckload quantities of liquefied petroleum gas is obtained, the shipment must conform to the routes, times and other safety conditions specified by the Fire Commissioner.

In implementing § 10.4b the Fire Department takes the position that the only shipments of bulk hazardous gas which need to pass through the City are those shipments bound for Long Island. Due to the location of bridges to Long Island, the City has no alternative to allowing these shipments to pass through the City. Regarding transportation between other points outside the City, the Fire Department takes the position that transportation through the City is unnecessary, because practicable alternative routes exist. The practical effect of these interpretations is that the Fire Department generally limits permits to pass through the City to shipments destined to and from Long Island, and these permits require use of the established route—that is, Tappan Zee Bridge, New England Thruway, and the Throgs Neck Bridge. Shippers located in New Jersey—such as Ritter—are generally prohibited from entering New York City except when using the established route.

Permits for transportation on the established route may be obtained on the telephone. The Fire Department currently records the permits granted, and assigns them a number.

As already stated, defendants had no permit for the trip of August 7, 1980. Defendants' crossing on the George Washington Bridge involved the use of a route which would not have been allowed by the Fire Department if request had been made.

Defendants contend that their use of the George Washington Bridge was lawful. They point out that the access roads leading to the George Washington Bridge, and the bridge itself, have signs designating a lane of the bridge for "Hazardous Materials" and for "Campers—Bottle Gas."

However, the regulations dealing with *tank truck quantities* of hazardous compressed gases are F.P. Directive 5–63 §§ 10.2 and 10.4b. A trucking company observing these regulations would receive routing instructions from the Fire Department, and would generally be directed to avoid the George Washington Bridge entirely. The signs on and near this bridge, referred to by defendants, are mainly intended to apply to truck loads of less hazardous material such as gasoline and fuel oil, and to small quantities of compressed gases such as propane in cylinders. In any event, the signs on and near the bridge do not supersede, or substitute for, the regulations.[1]

---

1. Defendants contend that they were misled by the George Washington Bridge signs, and that the Fire Department regulations were not brought to their attention. These contentions are supported in the most meager fashion in affidavits. No witness testified to this effect at the hearing.

The court doubts the credibility of the contention. In any event, even if it is true, it is not a bar to an injunction, which involves prospective relief rather than a penalty.

## III.

Defendants argue that Sections 10.2 and 10.4b of F.P. Directive 5–63 are inconsistent with, and preempted by, federal law. Defendants refer to certain provisions of the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. §§ 1801 *et seq.* and regulations issued under that statute. Defendants also refer to the Motor Carrier Safety Regulations, 49 C.F.R. Parts 390–397, issued under the Interstate Commerce Act, 49 U.S.C. § 304.

The HMTA was enacted by Congress in 1975. The statute unified in the Secretary of Transportation the power, previously scattered among four federal agencies, to promulgate regulations for the safe transportation of hazardous materials. 49 U.S.C. § 1804(a) provides in relevant part:

"(a) The Secretary may issue, . . . regulations for the safe transportation in commerce of hazardous materials. Such regulations shall be applicable to any person who transports, or causes to be transported or shipped, a hazardous material, or who manufactures, fabricates, marks, maintains, reconditions, repairs, or tests a package or container which is represented, marked, certified, or sold by such person for use in the transportation in commerce of certain hazardous materials. Such regulations may govern any safety aspect of the transportation of hazardous materials which the Secretary deems necessary or appropriate, including, but not limited to, the packing, repacking, handling, labeling, marking, placarding, and routing (other than with respect to pipelines) of hazardous materials, and the manufacture, fabrication, marking, maintenance, reconditioning, repairing, or testing of a package or container which is represented, marked, certified, or sold by such person for use in the transportation of certain hazardous materials."

49 U.S.C. § 1811 is entitled "Relationship to Other Laws," and specifically provides that any rule of a state or local entity inconsistent with the HMTA or regulations thereunder is preempted. The language of § 1811(a) is:

"(a) Except as provided in subsection (b) of this section, any requirement, of a State or political subdivision thereof, which is inconsistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is preempted."

Section 1811(b) sets up a procedure whereby the Secretary of Transportation may approve a local law even though that local law would be deemed inconsistent with the federal law. Section 1811(b) provides:

"(b) Any requirement, of a State or political subdivision thereof, which is not consistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is not preempted if, upon the application of an appropriate State agency, the Secretary determines, in accordance with procedures to be prescribed by regulation, that such requirement (1) affords an equal or greater level of protection to the public than is afforded by the requirements of this chapter or of regulations issued under this chapter and (2) does not unreasonably burden commerce. Such requirement shall not be preempted to the extent specified in such determination by the Secretary for so long as such State or political subdivision thereof continues to administer and enforce effectively such requirement."

Despite the availability of the § 1811(b) procedure, there is no *requirement* that a local government seek the approval of the Secretary in advance of putting into effect local regulations about the transportation of hazardous materials. In other words, if a local government deems its regulations to be *not* inconsistent with federal law, it can put them into effect subject to challenge by a party who contends otherwise. The objecting party may bring an "inconsistency proceeding" in the Department of Transportation, 49 C.F.R. § 107.203 (1979), or the question of inconsistency may be litigated in a court proceeding. The doctrine of primary jurisdiction does not require resort to the agency prior to seeking a court ruling on the question of inconsistency. *National Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 821–22 (1st Cir. 1979).

Certain regulations under the HMTA deal with the question of what local laws are to be deemed consistent or inconsistent with federal law. 49 C.F.R. § 107.209(c) (1979) relates to the standard to be applied in an inconsistency proceeding, and provides:

> "In determining whether a State or political subdivision requirement is inconsistent with the Act or the regulations issued under the Act, the Associate Director for [Operations and Enforcement] considers:
>
> (1) Whether compliance with both the State or political subdivision requirement and the Act or the regulations issued under the Act is possible; and
>
> (2) The extent to which the State or political subdivision requirement is an obstacle to the accomplishment and execution of the Act and the regulations issued under the Act."

Aside from the regulations under the HMTA, another set of federal regulations—the Motor Carrier Safety Regulations promulgated under the Interstate Commerce Act, 49 U.S.C. § 304—apply to shipments of hazardous gases. These are contained in 49 C.F.R. Parts 390–397 (1980). Section 390.30 deals with the preemption problem and provides:

> "Except as otherwise specifically indicated, [Motor Carrier Safety Regulations] are not intended to preclude States or subdivisions thereof from establishing or enforcing State or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations by the person subject thereto."

Defendants argue that the Fire Department regulations here in question are inconsistent with, and preempted by, certain of the HMTA regulations and Motor Carrier Safety Regulations. Defendants' principal argument is based on 49 C.F.R. § 177.853(a) (1979):

> "*No unnecessary delay in movement of shipments.* All shipments of hazardous materials shall be transported without unnecessary delay, from and including the time of commencement of the loading of the cargo until its final discharge at destination."

Defendants also rely on one of the Motor Carrier Safety Regulations, 49 C.F.R. § 397.9 (1980):

> "*Routes*
>
> (a) Unless there is no practicable alternative, a motor vehicle which contains hazardous materials must be operated over routes which do not go through or near heavily populated areas, places where crowds are assembled, tunnels, narrow streets, or alleys. Operating convenience is not a basis for determining whether it is practicable to operate a motor vehicle in accordance with this paragraph." [2]

Defendants contend that the Fire Department regulations, as enforced, are inconsistent with 49 C.F.R. § 177.853(a) because they result in "unnecessary delay" in the transportation of hazardous materials. Defendants argue that the most expeditious routes for various journeys—*i. e.*, New Jersey to southwestern Connecticut and New Jersey to Long Island—involve crossing the Hudson River into New York City and passage through the City; and that the use of more circuitous routes via the Tappan Zee Bridge and other similar Hudson River crossings results in unnecessary delay.

Defendants also contend that the Fire Department regulations run counter to 49 C.F.R. § 397.9, for two reasons. They point to the fact that certain journeys involving bulk hazardous gases are totally "banned"—*i. e.*, trips from New Jersey to Connecticut and other points north of the City. Defendants argue that Section 397.9 does not impose a flat ban on the bulk transportation of hazardous gas through populated areas, but only prevents such

---

**2.** Most of the Motor Carrier Safety Regulations were incorporated into the HMTA regulations by reference. 49 C.F.R. § 177.804 (1979). However, Section 397.9 was not so incorporat-ed. Nevertheless, this section has the force of federal law in regard to interstate truck shipments of hazardous materials and must be considered on the question of preemption.

transportation where "there is no practicable alternative." Defendants contend that the "bans" imposed by the City regulations go beyond the restrictions in Section 397.9 and are inconsistent with that section.

Defendants further argue that, even where some use of the City is permitted—*i. e.*, in journeys from New Jersey to Long Island—the route as a whole is so circuitous (involving extra costs of 35%) as to amount to a *de facto* ban from the City. In defendants' view, the route required by the City is not a "practicable alternative" within the meaning of Section 397.9.

### IV.

 In a series of rulings the Supreme Court has announced the general principles applicable to questions of preemption. Federal law preempts state and local law "where compliance with both federal and state regulations is a physical impossibility . . . ." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). In the absence of a direct conflict, however, federal law will preempt a state law which "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). The Supreme Court recently reaffirmed these principles in two preemption cases, *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978), and *Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26, 540–41, 97 S.Ct. 1305, 1309, 1317, 51 L.Ed.2d 604 (1977).

As already stated, the HMTA contains an express statutory provision dealing with the preemption problem. 49 U.S.C. § 1811(a). The provision has already been quoted. The essence is that a local law is preempted if it is "inconsistent" with the federal law. The Department of Transportation has issued a regulation, also quoted earlier, defining "inconsistency" for purposes of the HMTA. 49 C.F.R. § 107.209(c). This definition is quite obviously intended to embody the standards set forth in the Supreme Court decisions just cited—*i. e.*, that the

question of preemption depends, first, on whether there is a direct conflict between the federal and local rules making it impossible to comply with both, and second, if there is no direct conflict, whether the local rule would present an obstacle to the accomplishment and execution of the purposes and objectives of the federal law. Administrative rulings by the Materials Transportation Board of the Department of Transportation have expressly affirmed that Section 107.209(c) is based upon these Supreme Court holdings. *State of Rhode Island Rules and Regulations Governing the Transportation of Liquefied Natural Gas and Liquefied Propane Gas Intended to be Used by a Public Utility; Inconsistency Ruling*, 44 Fed.Reg. 75566 (1979) ("*Rhode Island Ruling*"); *City of Boston Rules Governing Transportation of Certain Hazardous Materials by Highway Within the City*, 46 Fed.Reg. 18918 (1981) ("*Boston Ruling*").

With regard to the Motor Carrier Safety Regulations, under the Interstate Commerce Act, there is no express preemption provision in the statute. However, as already indicated, the regulations deal with preemption in 39 C.F.R. § 390.30. This regulation makes the test for preemption whether compliance with the local rule would prevent full compliance with the federal regulations. The Materials Transportation Board of the Department of Transportation has interpreted Section 390.30 as providing a somewhat more limited reach for federal preemption than what is provided in the HMTA regulation, in that Section 390.30 refers solely to the first of the two HMTA tests—*i. e.*, the direct conflict test. *Boston Ruling, supra.*

In addition to providing general rules regarding preemption in the cases cited earlier, the Supreme Court has given a specific direction as to preemption in highway safety cases. The Supreme Court has stated that local highway safety regulations should be given deference and that they enjoy a strong presumption of validity. *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 443–44, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978).

The obvious reason for according deference to local safety regulations is that the local authorities are generally in the best position to consider problems unique to their area and to tailor their rules accordingly. This point was emphasized in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). In this case, the Court upheld a provision of a Washington State statute requiring tankers lacking designated safety features to navigate Puget Sound with a tugboat escort. The Court stated (435 U.S. at 171–72, 98 S.Ct. at 1001):

"A tug-escort provision is ... akin to an operating rule arising from the peculiarities of local waters that call for special precautionary measures, ...

"The relevant inquiry under [the federal law] with respect to the State's power to impose a tug-escort rule is ... whether the Secretary [of Transportation] has either promulgated his own tug requirement for Puget Sound tanker navigation or has decided that no such requirement should be imposed at all. It does not appear to us that he has yet taken either course." [3]

It is now necessary to apply these rules and standards regarding preemption, and determine whether the New York City Fire Department regulations are inconsistent with, and preempted by, federal law. Specifically, the question is whether F.P. Directive 5–63 §§ 10.2 and 10.4b, as they relate to the transportation of tank truck quantities of hazardous gases through the City, are inconsistent with the HMTA regulation, 49 C.F.R. § 177.853(a), or with the Motor Carrier Safety Regulation, 49 C.F.R. § 397.9.

As indicated earlier, the problem about the Fire Department regulations raised in this case is that, under these regulations, the Fire Department requires trucks of liquefied gas going to and from New Jersey to avoid a relatively short route over the George Washington Bridge and through New York City in favor of a more circui- tous route over the Tappan Zee Bridge and through Westchester County.

The questions are whether the Fire Department regulations "directly conflict" with the federal regulations, and, even if they do not, whether they conflict with the accomplishment and execution of the purposes and objectives of the statute and the regulations.

It is clear that the underlying purpose of the federal regulations, and of the statutory provisions under which they were promulgated, was to ensure protection against the risks to life and property which are inherent in the transportation of hazardous materials. *See* 49 U.S.C.A. § 1801. The purpose of 49 C.F.R. § 177.853(a), in requiring expeditious movement, was not to speed transportation for its own sake, but to protect the environs from unduly prolonged exposure to risks of fire and explosion. This policy is expressed even more forcefully in 49 C.F.R. § 397.9, which forbids the carrying of hazardous material through heavily populated areas except where no practicable alternative exists. This regulation expresses a strong presumption against transportation of hazardous materials through large cities for obvious safety reasons.

■ For these reasons it is clear that the Fire Department regulations, as enforced by the means here described, are entirely consistent with, and in furtherance of, the federal regulations and their underlying purposes. The truckers are required to avoid the most congested access routes and arteries within New York City, and to make a modest diversion which passes through a less congested and more rural area. It should be noted that the alternative routes involve interstate and other major highways, and are entirely fit for the expeditious transportation of the cargoes of gas.

The Secretary of Transportation has issued no regulations regarding the specific routing of hazardous gases in and around

---

3. The Court struck down, as preempted, certain other provisions of the Washington State law, which imposed equipment requirements deemed to affect commerce beyond the confines of the local area.

cities, including New York City, nor has he made any declaration preventing the local authorities from issuing their own routing regulations.

The defendants rely on the *Rhode Island Ruling, supra,* where the Materials Transportation Board of the Department of Transportation held that certain regulations of the State of Rhode Island regarding transportation of hazardous gases were inconsistent with 49 C.F.R. § 177.853(a) and preempted. However, the Rhode Island regulations were of a different character from the New York City Fire Department regulations in the present case. Rhode Island imposed a flat prohibition on the transportation of liquefied gas in the *entire state* during certain hours of the day. The ban embraced an area four times the area of New York City. It was not limited to cities, but it included rural areas. The Board's decision specifically discussed New York City as a situation where special local safety rules are warranted. Thus the *Rhode Island Ruling* does not support the argument that the New York City Fire Department regulations are preempted by federal law.

Defendants also refer to *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819 (1st Cir. 1979). In this case, the First Circuit upheld the district court's granting of a preliminary injunction against the enforcement of certain Rhode Island state regulations regarding the equipment on trucks transporting liquid gas. In the course of its opinion the court of appeals stated that the legislative history of the HMTA indicated a Congressional purpose to achieve a general pattern of uniform, national regulations in the area of hazardous materials transportation. The court voiced the view that there was an intent in the HMTA to have a broader degree of federal preemption than what is suggested in Supreme Court cases such as *Jones v. Rath Packing Co., supra.*

On its facts *National Tank Truck Carriers* is distinguishable from the present case, in that it dealt with requirements for the equipment on trucks, requirements which would inevitably have an effect beyond the state of Rhode Island. *See Ray v. Atlantic Richfield Co.,* 435 U.S. at 165–66, 171, 98 S.Ct. at 998, 1001. As to the First Circuit's view about a possible conflict between preemption under the HMTA and the standard set forth in the leading Supreme Court decisions, it should be noted that the agency charged with administering the HMTA has expressly adopted the standard in those Supreme Court cases, as already described in this opinion.

It is therefore held that F.P. Directive 5–63 §§ 10.2 and 10.4b, to the extent that they are brought into question in the present case, are not inconsistent with, or preempted by, federal statutes or regulations. In light of the unique conditions in the City which require special safety precautions, any transit delay caused by the enforcement of the City regulations promotes safety and is not "unnecessary delay" violative of 49 C.F.R. § 177.853(a). The route which tank trucks of hazardous gas are directed to use around New York City is a "practicable alternative" to routes through the City within the meaning of 49 C.F.R. § 397.9.

What has been said disposes of the main points on this motion. However, defendants also claim F.P. Directive 5–63 §§ 10.2 and 10.4b to be inconsistent with two other sections of the Motor Carrier Safety Regulations. Those sections are 49 C.F.R. § 392.-6, requiring motor carriers to obey local speed limits, and 49 C.F.R. Part 395, relating to hours of drivers' service. Defendants' arguments relating to these sections have no merit, and require no discussion.

V.

■ Defendants argue that the Fire Department regulations in question impose an unconstitutional burden on interstate commerce. The argument must be rejected. The routing requirements imposed by the City are based on a legitimate local safety interest and do not impose a disproportionate burden on interstate commerce. *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. at 440–42, 98 S.Ct. at 793; *Ray v. Atlantic Richfield Co.,* 435 U.S. at 179–80, 98 S.Ct. at 1005.

## VI.

Defendants argue that F.P. Directive 5–63 §§ 10.2 and 10.4b should be struck down as unconstitutionally vague. The argument is based on what defendants see as a contradiction between the Fire Department's practice under the regulations in prohibiting transportation of bulk liquefied gas across the George Washington Bridge, and the presence of signs on the George Washington Bridge and access streets that allegedly appear to permit use of the bridge for transporting such gas.

The argument is without merit. The current Fire Department regulations are sufficient to apprise a New Jersey trucking company such as Ritter of the fact that transportation of tank truck quantities of liquefied gas through New York City can only occur pursuant to a Fire Department permit. Compliance with the regulations and with the routing directions consistently issued by the Fire Department will prevent truckers of liquefied gas from approaching the George Washington Bridge. No confusion need arise as to the meaning of the signs on or near that bridge.

### Conclusion

Plaintiff has made an ample showing both in the state court and this court to the effect that defendants violated the Fire Department regulations in question with grave consequences. The City is entitled to an injunction requiring compliance, in order to avoid any repetition of the gross safety hazard presented by defendants' conduct. Defendants' arguments about the invalidity of the regulations are without merit. The motion to vacate the preliminary injunction is denied.

So ordered.